Number 03 Good morning, your honors. I'm Robert G. Ryan for the petitioner, Mr. Chen, who is seated in the second row. I'm showing his hand. His entire family is here today. I'd like to reserve two minutes for rebuttal. The main issue in this case is whether a reasonable adjudicator would have denied withholding of deportation with respect to China and Panama. We've also argued in this case that the humanitarian relief principles set out in the BIA's decision in matter of Chen should also be applied to withholding of deportation cases. And this circuit has generally adopted matter of Chen in Lau v. INS. Let's see if we can clarify a few things. Yes, your honor. The I.J. designated Panama as a country where he's to be returned. Yes, your honor. For him. Yes, your honor. And for the wife, designated China. Yes, your honor. And for the children, designated Panama. Yes, your honor. How did that come about? It was simply something that ---- You don't contest that here. Well, I would clarify one thing, your honor, and that is that only Mr. Chen is before the court. He's the only one who filed a notice of appeal. But we don't contest the statement.  That is correct, your honor. So that anomaly is a given for this appeal? That is correct, yes. For some reason, I had the impression that she also filed an appeal. She did not. She did not. No. It was a ---- he was the principal applicant. They were derivative applicants. Are they still within the system? Are they still considered derivative? The case were to be remanded, it's an interesting question. So probably, I don't know. That would be a question of first impression as far as I know, your honor. Is she still here in the country? Yes, she is. In fact, she's seated in the second row here today with her four children. All right. Three of the children are Panamanian citizens and one child is a U.S. citizen. So you have to get over two hurdles, Panama and China. That's correct, your honor. All right. Why would he suffer persecution if he was sent back to Panama? Let's start with Panama for just a few moments. Well, first of all, in 1989, during the terrible unrest of December of that year, he was attacked. It's clear from the record that he suffered a lot of pain. Terrible injuries are when he was stabbed. He claims by, and there's no credibility issue at all at this point, that he was attacked by. Was this in China or Panama? This is Panama, Judge Selma. This was in Panama. He states, he testified that he was attacked by Panamanian soldiers and civilians. He doesn't trust. That was during the period of, you know, there was substantial unrest in the country. Oh, yes, there was. A great deal of it. He ultimately left Panama, came to the United States, went back, came back to the United States and went back, and then came back. That's correct, your honor. Did anything happen to him when he went back on those? No, there's nothing on the record on those subsequent trips. But he was attacked because he was a Chinese store owner. They'd also suffered some theft in their store. And so he's claiming. You know, the brief refers to them as thugs. It's very hard for me to see this as a possible persecution by the government. Well, they are just described as thugs, but the term, Judge Noonan, thugs, and in this case the soldiers and civilians would not be mutually exclusive. But the record does show that he was attacked by Panamanian soldiers and civilians. During the United States invasion? That's correct, your honor. I don't see how that shows anything, really. Well, you're right, Judge Noonan. It doesn't really show anything. The question is whether there was a great deal of unrest at the time there was. Does it minimize the attack by the soldiers and the civilians? Minimize it, but you've got to show persecution. Well, yes, your honor, and he's basing it on his membership in a particular social group that is Chinese store owners in Panama. In a time of invasion by the United States, great social unrest, some thuggish soldiers attack him. What does that show? Well, it shows that they probably wouldn't be inclined to protect him because of his ethnicity. They attacked him, and we believe that he was attacked because of his ethnicity, and that's where the danger comes in. With respect to China, assuming arguendo that he would not be attacked again because of his class standing, he did testify that he was detained and beaten in 1980 because the Chinese authorities were looking for his father. His father had two twins at that time, and the authorities couldn't succeed in arresting his father, so they arrested him. He said he was taken to a small room and beat up throughout his whole body from noontime until midnight. He bled from the injuries, and he thought if he didn't escape, he would die. So he broke out of this detention cell, and he broke a window. In the middle of the night, he escaped. We believe that the burden of proof shifts to the government to prove the conditions have so fundamentally changed in China, he would no longer have the requisite fear of persecution, and we believe under the one child per family policy that he would still be persecuted again. He has four children. The penalties range from fines of sterilization and abortion. Yes. He left China and went to Panama. Yes. He was in Panama for about, what, 10 years before he came to the United States? About that period of time, Judge Pius, yes. Is it fair to say that he resettled in Panama? Well, the judge so found, and of course the court has to. What's your response to that? I'm asking you. Certainly. The court has no subject matter jurisdiction, of course, regarding that issue. So it's settled. Unfortunately, Congress is so legislated. So the issue there is would he have withholding of deportation with respect to Panama based on what we believe was past persecution there? Let's assume for a moment that he resettled to Panama. What does that do with his claim of persecution in China? Well, it doesn't affect China to the extent that if this court reverses the judge, the immigration judge, on the withholding of deportation issue, then he would not be subject to deportation to China. Of course, if the decision remains in effect, that he would be subject to deportation to China. But with respect to Panama, what's troubling here is that there's nothing in the record that shows that he has any legal status in Panama. His entry was on a bogus passport, which is admitted. It kept working. I'm sorry. It kept working. I'm sorry? It kept working. He kept working? Yes, but he hasn't been there since 1992. So we don't know. It's completely speculative as to whether he could return there. Now he has really no legal status there, and we believe he would be rendered stateless should the court order him deported to Panama. He'd be left as a man without a country. Okay. Would you like to save your remaining seconds? Yes. Thirty-three seconds, Judge. Thank you, Judge Pines. Yes. Good morning, Your Honors. Again, Greg Mack for the respondent. Could you explain the situation with the family? I don't really understand why he's being sent to different places. Certainly. The immigration judge designated Panama as the country of deportation for the lead petitioner, China for the wife, and Panama for the children. Why isn't the wife eligible for Panama? That's unclear from the record. Well, aren't you concerned with it? I mean, this is a family. You represent an administration that's interested in supporting the family. That's your responsibility. You represent the government. It's the government's responsibility, Your Honor, but it's also the petitioner who's the one who's in it. Yes, but you should take some responsibility on yourself. You're involved in this case. Correct, Your Honor. Do you understand that? Yes, I do understand. And you ought to be sure that they're all going to the same place. Well, there's nothing that's prohibiting them from going to the same place. The orders of deportation read to different locales. But I'm surprised you didn't know all the facts. You just take it as a bureaucratic shuffle is the wrong way to do it. Well, I'm sorry, Your Honor. You ought to take responsibility for the family. Do you understand that? I understand that, Your Honor. I didn't take it as a bureaucratic shuffle, Your Honor. I was simply noting that the immigration judge did designate several different places for the family. You should have been right on top of it and said you're doing the wrong thing. If you were there, I don't know whether you were there. No, I wasn't present. Well, you're whoever represented me. I wasn't present at the immigration hearing, but I think what the immigration judge did was try to sift through the varying locales. But it was a crazy decision. So go ahead from there. Well, I will submit it's not a crazy decision. It's a very comprehensive and thorough decision. I think it's a crazy decision to send the wife to China, is it not? You agree to that, don't you? No, I don't agree with that, Your Honor. The order of deportation reads that she would be deported to China. But, of course, the family itself can go on back to Panama. That's where the lead petitioner was ordered to be deported to, and that is where they would go back to. You say that as a matter of fact, that she has the right to go to Panama and not be put on a plane to China? Well, I think there's two steps. No, I'm asking you a question. Is that what you are saying is to be the truth, that she will not be put on a plane to China but will be allowed to go to Panama? I can't say that at this juncture, Your Honor. What I can say is there's two steps here. First is does the immigration judge's decision get sustained? If it gets sustained here, then there's the function of actually executing the order of deportation. I would submit that if the petitioner said, I want the entire family to go back to Panama, the Immigration and Customs Enforcement division Well, it seems to me, I'm just speaking for myself and not for the panel, but I think we ought to say everything, that this is worked out with certainty. We don't want to take chances, and you and the counsel ought to work this out so we're sure of it. Well, I think you can be sure that if you sustain the decision, then the Immigration and Customs Enforcement would entertain a request from No, no, we want to be sure it happens. You want the court, well, I think, again, you can take it in two steps. Sustain the immigration judge's order, and then at that point, if the petitioner chooses to send the entire family back to Panama, then choose that route. I think we need to be sure of it. Don't you think we ought to stay it so somebody doesn't get put on a plane? I don't think the court should stay that. If there's a concern in that regard, that concern should be presented in two different locales, either to the district director for the Immigration and Customs Enforcement or through a motion to reopen back to the immigration judge to modify the immigration judge's decision. I mean, you're giving me a bureaucratic shuffle. Well, it's not a bureaucratic shuffle, Your Honor. The first point here is whether the petition should be sustained or should it be assured the immigration judge You're not responding to the family needs. You're just giving me a lot of regulations. Well, the regulations are in place for a reason. It's to sort these things out. The court's jurisdiction here is to review the immigration judge's order of deportation and figure out whether it should be sustained. To the extent there are questions about the actual execution of that order of deportation, those questions can be taken up later. Those questions can be presented. Those questions can be presented. I wouldn't say that they would be foreclosed, but those questions can be presented to either the immigration judge or to the actual official who's going to execute the order of deportation in this regard. But what the immigration judge was trying to do was sift through the varying facts here, and once it became evident that this petitioner, the lead petitioner, was firmly resettled in Panama, it became evident that the deportation order had to read, as far as he was concerned, deported to Panama. And the children were also, at least several of them were born in Panama, one was born in the United States, and then the wife's order of deportation was denoted to China. Is the wife's claim and that of the children, is it all just derivative of Mr. Chen? I understand it to be derivative. So why didn't I.J. just say, you're all going to Panama, because that's the designated country for Mr. Chen. If it's all derivative, why was there a need to separate the family? Well, I don't know why the immigration judge laid out his order in that regard, Your Honor. That's the way the immigration judge laid out his order. It may have been the case because the wife was born in China, and both individuals were born in China, and the immigration judge laid that out. But, again, I would suggest to you that there's two steps here, sustain or not sustain the immigration judge's order of deportation. The question as to its actual execution are administrative questions for the immigration judge or the Board of Immigration Appeals to take up if there's a concern that these individuals are being split up in an order of deportation once it's actually executed. The question here in the court's jurisdiction has been invoked to review the immigration judge's decision on whether they should be entitled to asylum and whether the lead petitioner here was firmly resettled in Panama. And we would submit to the court that the petitioner was firmly resettled in Panama. Immigration law provides a safe haven, but it doesn't provide a safe haven in a particular country. I can't remember, but did the immigration judge grant Mr. Chin a period of voluntary departure? I believe the immigration judge did grant them voluntary departure, Your Honor. So what you were saying earlier to Judge Newton is that if Mr. Chin and the family decides to voluntarily depart, they can opt just to go back to Panama. Is that what you were saying? And as I understand it, this Court, in this Contreras-Aragon case, says this Court has jurisdiction with respect to voluntary departure. Again, it's a two-step process. We look at the immigration judge's decision on the merits, but as far as the actual execution of that order, that should be left to the immigration judge if they so choose to pursue that and they have a concern about the actual execution of that order of deportation. But what's clear here is that petitioner was firmly resettled in Panama. But how does that relate to his claim of persecution in China or his fear of going back to China? It relates in this regard. The immigration judge found that that was speculative, and it was speculative because he would be removed back to Panama and not to China. And further, with respect to China, there's nothing in this record here to suggest that the policy, the course of population control policy of China, is employed against those who are returning to China with more than one child. And there's nothing in this record on that regard, and there's nothing in the State Department reports that suggests anything to the alternative. And again, the petitioner here, it's interesting that there's a claim with respect to persecution in China, but in 1990, there's a passport that they sought from the Chinese embassy in Bogota. So if you have a claim with respect to being harmed in China, why are you going to the embassy in Bogota, Colombia, to get a passport back to China? And that's in the record at 701. So that belies a claim that there's a fear of persecution in China. But in any event, the family can return back to Panama. This is a businessman who went to the United States on three occasions, and not once on those three occasions did that individual apply for asylum. And so therefore, the court should sustain the immigration judge's determination in that regard. And with respect to withholding of deportation in Panama, that was a time of civil and military strife, and as the immigration judge correctly found, there's nothing in this record that suggests that whatever happened to the petitioner down in Panama at that time of civil strife was related to one of the protected characteristics under the withholding of deportation statute. And there's nothing further that the government would submit. Thank you. Thank you. You have 30 seconds. There is something in the record. There is something in the record on the one child per family policy. It's at Administrative Record 411. This is on persons who have had children born in the United States. A green card holder would be exempt. The U.S. green card holder would be exempt from the one child norm. But a person who conceived a second child without approval while on a student or visitor visa would be subject to the same penalties that a resident in China must bear, no more, no less. 1995 country profile. Again, that's at Administrative Record 411. No reasonable I.J. would have so ordered a split of the family in this case. Let me ask you this. Yes. Do you know if we were to sustain the I.J.'s decision, is it the family's desire to remain united and go back to Panama? No, Your Honor. No, it's not? My understanding is not that that would not be acceptable. He doesn't have any legal status in Panama to begin with. It's totally speculative whether the Panamanians would accept him in the first place. He'd be rendered stateless is what would be, we think, the likely result. Are you telling us there's not a desire to maintain the family unit wherever that is? There is a complete desire to maintain the family unit here in the United States of America. Yes. My question, though, is just suppose, assume for a moment that we were to sustain the I.J.'s finding. Okay? Yes, Your Honor. My question was is the family desirous of remaining together than going to Panama or going to China? As far as I can tell from the record, Your Honor, the family might have to split up. They might have the children remain here. This is pretty common, by the way, in immigration cases. Sometimes they'll just say. So you don't know? I don't know. It's not clear from the record, but it's not uncommon for there to be, unfortunately, a splitting up of a family because this country offers so many more opportunities and is the beacon of freedom of the world. Mr. Mann, you can sit down. Mr. Mann, would you take the lectern again? I just wanted to get your response to that. Well, it was read from the record as the population policy of China. If you returned with more than one child. Well, there was a statement there if you returned with a green card, the policy wouldn't apply. But there's also the statement that I guess the State Department had said that it would be applied. But, again, in this case the policy would apply, right? Well, I'm not sure that's the extent of the State Department's statement as far as it being applied. Do you know anything to the contrary? I don't know anything to the contrary. Well, why did you tell us it didn't apply? Well, I didn't believe that that policy applied. You didn't believe it, but you just stated it as a matter of belief. You stated it as the law. You misrepresented it to us. Well, I said there was nothing in the record that suggested the policy would apply. Well, you should be very careful what you state to a court as a law officer. Certainly, Your Honor. I didn't mean to mislead the court. And if there's an impression that I did, I certainly apologize, Your Honor. Any other questions? Thank you. All right. Thank you. The matter will be deemed submitted. See, our ñ well, we'll give counsel a chance to clear off the table. Thank you.
judges: Noonan, Paez, Selna